UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EDUARDO TOMEO; JOSEPH MORDEN;       )
PAMELA SLAUGHTER; and FRANK         )
LOPEZ, individually and on behalf of all   )
others similarly situated,                 )
                                            )
                    Plaintiffs,             )
                                            )        No. 13 C 4046
        v.                                  )
                                            )        Judge Sara L. Ellis
CITIGROUP, INC. and CITIMORTGAGE,   )
INC.,                                       )
                                            )
                    Defendants.             )

## OPINION AND ORDER

Plaintiffs Eduardo Tomeo, Joseph Morden, Pamela Slaughter, and Frank Lopez bring a

class action complaint against CitiGroup, Inc. and CitiMortgage, Inc. (collectively, "Citi").

Plaintiffs assert that Citi violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C.

§ 227 *et seq.*, by calling their telephones using an automatic telephone dialing system ("ATDS")

without their express consent. Tomeo[1] seeks to pursue the action not only individually but also

on behalf of the two following classes:

> Cease and Desist Class: All persons (1) during the period of
> October 27, 2010 to November 30, 2014 (2) to whom Citi placed
> two or more voice calls or short message service (SMS) calls (3)
> using the Aspect UIP or Genesys dialers (4) and Citi's business
> records indicate the person requested not to be called.

> Wrong Number Class: All persons (1) during the period of October
> 27, 2010 to November 30, 2014 (2) to whom Citi placed two or
> more voice calls, (3) using the Aspect UIP dialer, (4) and Citi's
> business records indicate that Citi was told that it had called the
> wrong number.

---

[1] Although Tomeo is not the only plaintiff in this case, Plaintiffs' counsel seek to have the class certified
with Tomeo as the only class representative for both classes.

Doc. 123 at 7.  Tomeo seeks certification under Federal Rule of Civil Procedure 23(b)(3).  Citi responds that individual issues concerning consent predominate, that Tomeo is neither an adequate nor a typical class representative, and that a class action is not a manageable or superior way to proceed; thus, the Court should not certify either class Tomeo proposes.  Citi also seeks to strike Jeffrey A. Hansen's expert and rebuttal reports.  Because Tomeo has not satisfied his burden of establishing that common issues of fact or law predominate, the Court denies Tomeo's motion for class certification.  Additionally, the Court grants in part and denies in part Citi's motion to strike.

## BACKGROUND

### I.  Citi's TCPA Compliance

 In its capacity as a loan servicer, Citi uses call centers to contact parties with whom it has a pre-existing relationship[2] that implies consent to make such calls.  Citi used the call centers to place calls and send text messages to these individuals' cell phones.  For at least some portion of those calls and texts, Citi used an Aspect UIP dialer to place calls and a Genesys Engage system to send text messages.

Three different types of computerized records contain information relevant to whether Citi has the necessary consent to contact a phone number.  The CitiLink loan servicing system, which contains basic accountholder information and Individual Note Screens where Citi representatives record the details of their interactions with the accountholder, houses one type of record.  Citi's default-related loan servicing system (the "DRI System"), which contains similar information to the CitiLink system, but only for accounts in default, holds another type of record.  Finally, FileNet, the imaging system that Citi uses to store digital versions of correspondence and

---

[2] For the sake of simplicity, the Court will refer to those individuals with a pre-existing relationship with Citi as "accountholders."

other paper documents relevant to each account has additional information relating to whether an individual has consented to Citi's calls.

Citi has various policies in place to ensure that it only reaches out to individuals who have consented to receive contact. Citi permits its callers to call an account nine times per day, although it limits calls to cell phones to three attempts per day. If an accountholder asks Citi to stop contacting a specific number, then Citi's policies instruct its representative to add a "Do Not Call" flag to that phone number. If the accountholder requests that Citi stop all communication, Citi's policies provide that its representative place a "Cease and Desist" flag on that person's account. Once an account has a "Cease and Desist" flag, Citi reviews its records to determine whether the accountholder made the request to stop calling in writing. If the request was not in writing, for accountholders in states where requests to stop calling landlines must be in writing, Citi then removes the "Cease and Desist" flag from the account and opens a "Case 998" investigation to assess consent and request that the accountholder confirm in writing that the accountholder no longer consents to contact. Finally, if, in the process of attempting to reach an accountholder, Citi contacts the wrong number, then Citi's policies instruct its representative to flag that phone number as "WRNG." When an account has any one of these flags engaged, Citi's autodialing system should not contact the phone number/account at issue.

## II.    Expert Reports

According to Citi, it produced documents to Tomeo in three general categories: (1) calling and texting data for 2010–2014, including Cease and Desist and Case 998 data, as well as Error Reports,[3] (2) output reports from its Aspect UIP dialer (the "Aspect Calling Data"), which

---

[3] These consist of daily spreadsheets that identify potential departures from any of Citi's calling procedures or potential coding errors.

listed the 138.7 million calls that it dialed from October 2013 to August 2015, and (3) samples of Individual Note Screens from its CitiLink system for 9,893 accountholders.

Tomeo's case rests upon his assertion that Citi used autodialers to contact phone numbers after having been asked to stop calling those numbers or told that those numbers were the wrong number. To support his contention that this case is eligible for class certification, he submitted an expert report by Jeffrey Hansen (the "Hansen Report"). In his report, Hansen articulated his opinions on the Aspect and Genesys dialers that Citi used to contact individuals and the number of calls to cell phones that Citi made using the Aspect dialer. Hansen also analyzed the number of calls Citi made to cell phones using the Aspect dialer after a representative coded the account attached to that number with Wrong Number, Cease and Desist, or Case 998 flags. Citi responded with expert reports from two experts—Ken Sponslor and John Taylor (the "Sponslor Rebuttal" and "Taylor Rebuttal"). One of the principle critiques made in the Sponslor and Taylor Rebuttals was that Hansen did not identify a reliable method by which to establish TCPA violations on a classwide basis because the issue of whether Citi had consent to contact an individual requires a specific investigation of each account. Both experts noted that accountholders typically pendulate back and forth between withdrawing consent and re-consenting to contact, and so the mere fact that an account had a Do Not Call or Cease and Desist flag at one point in time does not establish a lack of consent in the future. Similarly, accountholders frequently tell Citi's representative that Citi has contacted the wrong number in order to avoid speaking to Citi, and then later contact Citi using the same number. According to Citi's experts, the only way to determine whether an individual consented to calls would be to individually review each of the accounts, including the Individual Note Screens.

In response to the Sponslor and Taylor Rebuttals, Hansen wrote a reply report (the "Hansen Reply"). In the Hansen Reply, Hansen responded to Sponslor and Taylor's critiques regarding the individualized analysis of consent in two ways. First, he stated that, contrary to Sponslor's and Taylor's assertions, the Individual Note Screens can be mass-searched for evidence that the accountholder re-consented to a phone call. Second, he analyzed additional data (the "Additional Cease & Desist Data") that he had not analyzed previously. According to Hansen, the Additional Cease & Desist Data contained instances where Citi determined through an internal audit process that it had made an error regarding flagging and call handling of Cease and Desist, Do Not Call, and Attorney Representation flags. Doc. 121 Ex. 6 ¶ 73.

## LEGAL STANDARD

### I.     Expert Opinion Testimony

The admissibility of expert opinion testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed 2d 469 (1993). *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Rule 702 provides that a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of opinion or otherwise provided that "(a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. To admit expert testimony under this rule, the Court must determine that (1) the witness is qualified, (2) the expert's methodology is reliable, and (3) the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *Myers v. Ill. Cent. R. R. Co.*, 629 F.3d 639, 644 (7th

Cir. 2010). The Rule 702 inquiry "is a flexible one," however. *Daubert*, 509 U.S. at 594.

"Determinations on admissibility should not supplant the adversarial process; 'shaky' expert

testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v.*

*McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). The proponent of testimony bears the burden of

proving that the proffered testimony meets these requirements, and the Seventh Circuit grants the

district court "wide latitude in performing its gate-keeping function." *Bielskis*, 663 F.3d at 894.

## II.    Class Certification

Class certification is appropriate where a plaintiff can meet the four requirements of Rule

23(a)—numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P.

23(a). Additionally, a plaintiff must also satisfy one of three subsections of Rule 23(b). Fed. R.

Civ. P. 23(b); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Here, Plaintiffs seek

certification under Rule 23(b)(3). Rule 23(b)(3) requires a finding that "questions of law or fact

common to class members predominate over any questions affecting only individual members,

and that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Finally, although not an explicit

requirement of Rule 23, the party seeking certification must demonstrate that the class members

are identifiable. *Oshana*, 472 F.3d at 513.

The Court has broad discretion in determining whether it should certify a proposed class.

*Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998). The party seeking certification bears the

burden of demonstrating that certification is proper by a preponderance of the evidence.

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). The Court must

engage in a "rigorous analysis," resolving material factual disputes where necessary. *Wal-Mart*

*Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011); *Szabo v.*

*Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). For example, "when an expert's report or testimony is critical to class certification . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010). But "[i]n conducting [the Rule 23] analysis, the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner*, 669 F.3d at 811; *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66, 133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013) (courts consider merits questions only to the extent relevant to determining whether the proposed class has met Rule 23's prerequisites).

## ANALYSIS

### I.    Motion to Strike Jeffrey Hansen's Expert and Rebuttal Reports

The Court first turns to Citi's motion to strike Hansen's expert reports. Citi argues that the Court should strike Hansen's reports because they do not satisfy the standards set forth in *Daubert* and Federal Rule of Evidence 702. According to Citi, Hansen's analysis is not helpful because it does not offer a common method for determining consent, Hansen's methods are not reliable, and Hansen's opinion that Citi's dialing systems are ATDS is a legal opinion that is not based on sufficient facts and data. Citi further contends that the Court should exclude the Hansen Reply because it does not meet the requirements of Federal Rule of Civil Procedure 26. Because Hansen's opinion regarding Citi's dialing system is a legal opinion not based on sufficient facts and data, and portions of the Hansen Reply do not comply with Rule 26, the Court grants Citi's motion to strike in part. However, the expert report that Citi primarily relies upon in its motion to strike is itself procedurally improper. The Court, therefore, also excludes

the Taylor Declaration attached as Exhibit E to Citi's opposition to Tomeo's motion for class certification.

### A.     *Daubert* and Fed. R. Evid. 702

#### 1.     Hansen's Qualifications

Citi does not attack Hansen's qualifications, and a review of Hansen's qualifications demonstrates that he is a qualified expert witness here.  "'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" *Gayton*, 593 F.3d at 616 (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)).

Hansen has served as an expert witness or consultant in more than 150 TCPA class actions.  He frequently consults companies on the use of autodialers—in that capacity, he has "assembled, configured, maintained, and operated all aspects of autodialers."  Doc. 121, Ex. 3 ¶ 5.  Hansen's work with autodialers has included work with predictive dialers, such as setting up and maintaining predictive dialers capable of generating over one million calls per hour.  Further, Hansen has experience using databases containing cell block identifiers and ported number lists. Other courts in this district have recently found that Hansen is qualified to provide expert testimony regarding similar subjects.  *See Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 578 (N.D. Ill. 2018) (finding that Hansen was qualified to testify as an expert "on the unique cell phone numbers [the defendant] called in its telemarketing campaign").  In this case, Hansen seeks to testify about the type of autodialers that Citi used and the number of calls Citi made to unique cell phone numbers after Citi coded those numbers in a specific way (Cease and Desist, Wrong Number, etc.).  The Court finds that he is qualified to do so.

### 2.     Reliability

Citi argues that Hansen's methods are not reliable.  Tomeo responds that the Court should strike one of the expert reports upon which Citi relies to make its argument (the Taylor Declaration, Doc. 151), because that expert report is procedurally improper.  Before the Court delves into a reliability analysis of Hansen's reports, it addresses whether it is appropriate to consider the Taylor Declaration in conducting that analysis.

Tomeo's response essentially raises a motion to strike within the motion to strike: he requests that the Court ignore the statement by John Taylor, which Citi attached as Exhibit E to its opposition to Tomeo's motion for certification.  *See* Doc. 151.  The declaration is dated February 7, 2018, and Taylor wrote it in response to Hansen's reply report.  Doc. 151 ¶ 2. Tomeo argues that this declaration is procedurally improper because Citi submitted it after the close of expert discovery and further, Citi did not move to extend the deadline or for permission to submit a sur-rebuttal.  Citi expresses incredulity at Tomeo's request and argues that the Court did not impose deadlines for declarations like Taylor's.  The Court does not follow the logic of Citi's response: Citi does not (and cannot credibly) dispute that Taylor's declaration contains an expert opinion, but still seems to believe that it does not fall within the rules governing disclosure of expert opinions.  Rechristening Taylor's opinion as a "declaration" does not exempt it from the requirements of Rule 26 and the Court's own deadlines.  Regarding expert testimony, Rule 26 provides that "[a] party must make disclosures at the times and in the sequence that the court orders."  Fed R. Civ. Pro. 26(a)(2)(D).  Unless Citi can show that the failure to provide Taylor's report in a timely manner was justified or harmless, the Court should exclude it. *Finwall v. City of Chicago*, 239 F.R.D. 494, 500 (N.D. Ill. 2006) (citing *Keach v. U.S. Trust Co.*, 419 F.3d 626, 639 (7th Cir. 2005)).  The Court granted extensions on expert discovery deadlines

liberally in this case, including extensions after the date of Hansen's rebuttal report, but expert discovery closed when Defendants deposed Hansen on January 17, 2018, and Citi sought no extension of this deadline. Citi does not explain why its untimeliness is justified. It does argue that the untimeliness is harmless, contending that Tomeo could have sought to re-depose Taylor after it filed his declaration. Doc. 170 at 15. But this ignores the fact that expert discovery had already closed byt this time, and so Tomeo could not have re-deposed Taylor. *See Bowman c. Int'l Bus. Mach. Corp.*, No. 1:11-cv-0593-RLY-TAB, 2012 WL 6596933, at *3–4 (S.D. Ind. Dec. 18, 2012) (finding that the plaintiffs' untimely expert rebuttal reports were not harmless because "reopening discovery to re-depose Plaintiffs' experts would create significant costs and would delay the resolution of the motion for class certification"). Because the Taylor declaration is untimely and Citi has not justified why the Court should consider it nor demonstrated why such consideration would be harmless, the Court strikes the Taylor declaration.

Turning to the reliability of Hansen's reports, Citi specifically contends that Hansen's reports are unreliable because Hansen (1) did not confirm the accuracy of the information he used to identify which numbers were cell phone numbers, (2) inflated the total number of calls by double counting over one million calls, (3) counted calls that were never made, (4) counted calls that Citi had not identified as errors, (5) overlooked certain codes in the data that showed that calls had been made with consent, and (6) used a paralegal to conduct data analytics. Hansen responds that these arguments go to the weight of the evidence, rather than reliability, and that assistance from a paralegal does not call his expert opinions into question.

Although "the district court's admissibility determination is not intended to supplant the adversarial process," proposed testimony must be "reasoned and founded on data." *Bielskis*, 663 F.3d at 894. The testimony must be "based on sufficient facts or data," use "reliable principles

and methods," and "reliably apply the principles and methods to the facts of the case." Fed. R. Evid. 702. To make such a determination, the Court evaluates an expert's proposed testimony "by considering its error rate, whether the methodology has been or is capable of being tested, whether it has been subject to peer review, and whether it is generally accepted in the relevant community of experts." *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014). Expert testimony may not "be based on subjective belief or speculation," and the expert must "explain the methodologies and principles that support his opinion; he cannot simply assert a bottom line." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). However, "[t]he district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013).

Citi initially contends that Hansen did not confirm the accuracy of the information that he used to identify which numbers were cell phone numbers. Hansen used two different databases to determine which numbers Citi called using the Aspect UIP Dialer belonged to cell phones. First, Hansen compared the numbers listed in the Aspect Calling Data to a wireless cell block identifier list. Doc. 121 Ex. 3 ¶ 43. Next, Hansen compared the Aspect Calling Data to a ported-to-wireless list and ported-to-landline list to determine which numbers had been reassigned from landline to cell phone or vice versa. Doc. 121 Ex. 3 ¶ 44. According to Hansen, the telemarketing industry accepts both these methods. Doc. 121 Ex. 3 ¶¶ 38–40. And the *Toney* court recently found that Hansen's use of these methods was reliable. 323 F.R.D. at 579–80. The Court, therefore, declines to strike Hansen's opinions on this basis.

Citi's next three arguments—that Hansen's reports double counted over one million calls, counted calls that were never actually placed, and counted calls that Citi had not identified as errors—rely entirely on the Taylor Declaration for support. Because the Court has excluded the Taylor Declaration, Citi has no support for these contentions. And Citi's next criticism assumes conclusions that Hansen does not make. Citi argues that Hansen overlooked codes in the data that showed that calls had been made with consent; however, Hansen does not purport to identify calls where the individual had not consented to be called. In fact, he explicitly states that he "did not offer an opinion on the legal issue of whether or not the accountholder 'consented' to the calls." Doc. 121 Ex. 6 ¶ 63. Finally, Citi argues that Hansen's reports are unreliable because of Hansen's reliance upon a paralegal. Citi contends that Rachel Hoover carried out some of the queries on which Hansen relied in his reports and that Hansen's answers about the assistance she provided were misleading. In his first deposition, when asked if any other individuals worked on his rebuttal, Hansen replied, "No. I have -- I have had others help proofread things and make sure things were understandable." Doc. 148-9 at 72:8–9. In his next deposition, when asked about it again, Hansen stated that he had Rachel Hoover run some of the same searches "as another way of watching for any possibility of errors." Doc. 148-10 at 85:18–19. Without more information, the Court does not see evidence that Rachel Hoover performed tasks that Hansen should have performed, or that Hansen misled Citi with his testimony about her assistance. And the Seventh Circuit has noted that it "find[s] nothing remarkable about a paid expert preparing a report with the assistance of staff." *Manpower*, 732 F.3d at 810. Ultimately, the Court rejects Citi's challenges to the reliability of Hansen's reports.

### 3. Assistance to the Trier of Fact

Rule 702 requires that expert reports "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This requirement 'goes primarily to relevance.'" *Cates v. Whirlpool Corp.*, No. 15-CV-5980, 2017 WL 1862640, at *11 (N.D. Ill. May 9, 2017).

Citi's argument here primarily sets forth the reasons that it believes that Hansen's opinions do not properly address the issue of consent. In support of its argument, Citi relies on *Cates*. In *Cates*, the plaintiffs offered an expert opinion to establish that the products at issue in the class action all shared the same defect, and the court held that the expert opinion was unhelpful because it failed to identify the design defect. 2017 WL 1862640, at *12–13. Unlike there, where the expert report did not help the district court resolve any of the issues presented in the class certification motion, Hansen's expert report does opine on issues relevant to the class certification motion in front of the Court. Citi does not explain why an expert opinion in a TCPA case must address consent in order to be helpful. It is correct that an expert opinion that establishes consent would be helpful in the context of this class certification motion, but that is not the only issue on which an expert opinion would be beneficial. Hansen's expert report identifies which calls and texts Citi made to cell phones using the Aspect and Genesys dialers, and which of those calls and texts occurred after the individual associated with that phone number requested that Citi stop contacting them or told Citi that it had the wrong number. Tomeo raises this issue as a common issue of law and fact in his class certification brief. Doc. 123 at 17. It is relevant to the Court's class certification analysis. A party's expert opinions do not need to be relevant to every single issue raised; such a holding would be untenable. Consent is but one of many issues present in Tomeo's class certification motion, and Hansen's expert

opinion presents relevant and helpful information about which cell phone numbers Citi contacted within the proposed Classes using its Aspect and Genesys dialers.

Citi also asks the Court to exclude Hansen's opinions that Citi's dialing systems are ATDSs on the basis that those are legal opinions and are not based on sufficient facts and data. Tomeo does not respond directly to Citi's point that those opinions are impermissible legal opinions, rather advocating that many courts have held that the Aspect UIP dialer is an ATDS. But, "[a]s a general rule, . . . an expert may not offer legal opinions." *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013). Determining whether a dialer is an ATDS under the TCPA's definition is a legal opinion. *See Keys v. Ocwen Loan Servicing, LLC*, No. 17-cv-11492, 2018 WL 3914707, at *5 (E.D. Mich. Aug. 16, 2018), *appeal filed*, No. 18-1989 (6th Cir. Aug. 29, 2018) ("Hansen has not only defined the governing legal standard by providing an extensive history and explanation of what constitutes an ATDS under the TCPA and the Commission's guidance, but he has also impermissibly applied that standard to the facts of this case by concluding that [the defendant's] Aspect System is an 'ATDS as contemplated by the TCPA and clarified by the FCC[.]'"); *Strauss v. CBE Grp., Inc.*, No. 15-62026-CIV-COHN/SELTZER, 2016 WL 2641965, at *2 (S.D. Fla. Mar. 23, 2016) ("Because Hansen may not offer a conclusion as to the legal definition of an ATDS, or the legal implications of using a predictive dialer, the Court will exclude the portions of [his] Report stating that [the defendant] used an ATDS and that the equipment used to call Plaintiff fits within the statutory definition of ATDS."). Tomeo's response does not address the fact that it is improper for an expert witness to opine on legal issues, regardless of whether he is correct (a matter the Court will address at the appropriate juncture). Accordingly, the Court excludes Hansen's references to ATDSs in his reports. Doc. 121 Ex. 3 ¶¶ 28, 33.

Finally, Citi argues that Hansen's opinions are not based upon sufficient facts and data because he did not physically inspect Citi's dialing systems. This argument goes directly to the text of Rule 702, which requires that the expert's testimony be "based on sufficient facts or data." Other district courts have excluded Hansen's testimony for similar reasons. *See Keyes*, 2018 WL 3914707, at *3–4 (finding that, because Hansen had not physically inspected the defendant's dialer, "Hansen's report is 'unsupported speculation' and a 'mere guess' regarding how [the defendant] uses the Aspect System to make calls" (citation omitted)); *Mohamed v. Am. Motor Co.*, No. 15-23352-Civ-COOKE/TORRES, 2017 WL 4310757, at *4 (S.D. Fla. Sept. 28, 2017) (noting that, where Hansen merely reviewed information from the defendant's website and YouTube videos, he did "not have sufficient information on which to base his opinion, rendering it simply 'the *ipse dixit* of the expert'" (citation omitted)); *Legg v. Voice Media Grp., Inc.*, No. 13-62044-CIV, 2014 WL 1767097, at *5 (S.D. Fla May 2, 2014) (emphasizing that the expert "cannot even say whether [the defendant's] own equipment conforms to the specifications discussed in its handbook" because he never actually examined the equipment). Here, Hansen relied upon manuals that Citi produced and his experience and knowledge of predictive dialers to make his determinations about Citi's dialers. Doc. 121 Ex. 3 ¶¶ 29, 34. However, Hansen did not physically inspect Citi's dialers, and he admitted that in fact he had never physically worked with an Aspect UIP dialer. Doc. 148-9 at 26:8–9. Tomeo attempts to distinguish the cases excluding dialers that had not been physically examined by arguing that those dialers were customized, whereas "Aspect is an off-the-shelf system" and "there is no evidence in the record that Citi customized the equipment." Doc. 165 at 17. Perhaps if Tomeo provided support for its contention that Citi's dialer had not been customized, this would be enough. But it is Tomeo's burden to demonstrate that his expert reports and testimony are admissible, and he has not

provided that support.  Just as in *Legg*, Hansen cannot even credibly state that Citi's equipment conforms to the specifications discussed in the manual.  Because the Court finds that Tomeo has not shown that Hansen's opinions regarding Citi's dialers are based on sufficient facts and data, the Court excludes the portions of Hansen's reports that make findings regarding the function of Citi's dialers.

### B.     Hansen's Reply Report

Citi's last argument in support of its motion to strike is that the Hansen Reply improperly includes new methodology that goes beyond his initial report.  According to Rule 26, expert rebuttals are meant to "contradict or rebut evidence on the same subject matter" in the initial expert report.  Fed. R. Civ. P. 26(a)(2)(D)(ii).  "The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party."  *Peals v. Terre Haute Police Dept.*, 535 F.3d 621, 630 (7th Cir. 2008) (internal quotation marks omitted).  "Similar to reply briefs, advocates cannot advance new arguments for the first time in a reply expert report."  *Sloan Valve Co. v. Zurn Indus., Inc.*, No. 10 C 204, 2013 WL 3147349, at *1 (N.D. Ill. June 19, 2013).  Reply reports "cannot be used to advance new arguments or new evidence to support plaintiff's expert's initial opinions."  *Lowe v. CVS Pharmacy, Inc.*, No. 14 C 3687, 2017 WL 2152385, at *2 (N.D. Ill. May 17, 2017) (internal quotation marks omitted).

*Lowe* is instructive here—in fact, it involves the same experts.  There, Taylor opined that a certain method to determine consent would not be effective due to the volume of calls at issue in the case, and Hansen responded with his opinion that the analysis would work, and he also conducted the analysis.  *Id.* at *1.  The court decided that Hansen's reply could include his opinion that the analysis was possible, but that it would not consider the actual results of the analysis.  *Id.* at *2.  The Court will split the baby similarly here: Hansen's testimony that one can

16

determine consent based on a mass-analysis of the Individual Note Screens is appropriate because it replies to Taylor's testimony to the contrary. However, Hansen's testimony and analysis regarding the Additional Cease & Desist Data goes beyond the scope of the Taylor and Sponslor Rebuttals, and so the Court will exclude it from consideration. Tomeo attempts to distinguish *Lowe*, arguing that in that case, Hansen "provided new testimony that did not directly respond" to Taylor's report. Doc. 165 at 15. Selectively quoting Lowe makes Tomeo's argument tempting: "Because Taylor did not opine on the number of calls for which there was consent, there would have been no basis for Hansen to address that issue in rebuttal." *Id.* at *2. Taylor's analysis of a sample of the Individual Note Screens here did relate to whether consent existed in that sample; however, the point of the analysis was not to uncover instances of consent, but rather to demonstrate that one could not determine consent without individualized analysis. Thus, any reply by Hansen is limited to addressing those arguments. Hansen's analysis of a new data set that neither he nor Taylor used in previous reports to determine the existence of consent goes beyond the scope of the Taylor Rebuttal. It would be unfair to Citi to allow Hansen to include such analysis. In the briefing on this motion to strike, both parties want the Court to hold their opponent to strict standards regarding discovery rules and deadlines, while simultaneously arguing that they deserve an exemption from those very same rules. The parties cannot have it both ways—what is good for the goose is good for the gander. The Court has already held Citi to strict standards when it decided to exclude expert reports submitted after expert discovery closed, and it will hold Tomeo to those same standards. Thus, the Court excludes Hansen's opinions in the Hansen Reply regarding the Additional Cease & Desist Data.

17

## II.      Motion to Certify Classes

To certify a class, Tomeo must show, by a preponderance of the evidence, that he has satisfied Rule 23(a)'s requirements.  *Messner*, 669 F.3d at 811.  Tomeo must also satisfy one of Rule 23(b)'s requirements.  Fed. R. Civ. P. 23(b); *Oshana*, 472 F.3d at 513.  Tomeo seeks certification under Rule 23(b)(3).  Certification is proper only if Tomeo satisfies both the requirements of Rule 23(a) and (b).  Because the Court finds that common issues of fact do not predominate over the questions affecting individual members, the Court denies certification of the Rule 23(b)(3) classes.

Tomeo seeks to certify two classes pursuant to Rule 23(b)(3): a Cease and Desist Class consisting of individuals who received calls or texts on their cell phones from Citi using the Aspect or Genesys dialers after they requested not to be contacted and a Wrong Number Class consisting of individuals who received calls or texts on their cell phones from Citi using the Aspect or Genesys dialers after they had informed Citi that it had the wrong number.  The Court finds that the issue of consent is decisive here: because individual questions of consent predominate, Tomeo has not carried his burden of establishing that common issues predominate.

As a preliminary issue, the Court finds it irrelevant that consent is an affirmative defense rather than part of the cause of action.  The need for individualized inquiries with respect to an affirmative defense may still defeat the predominance requirement.  *See Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008) ("Whether established by [Citi] as an affirmative defense or by [Tomeo] as an element of the cause of action, the issue of consent will entirely determine how the proposed class-action trial will be conducted on the merits."); *Jamison v. First Credit Servs., Inc.*, No. 12 C 4415, 2013 WL 3872171, at *6 (N.D. Ill. July 29, 2013) ("Individualized issues necessary to decide an affirmative defense may predominate so as to

18

prevent class certification. For purposes of class certification, it is [plaintiff's] burden to prove

that they do not." (citations omitted)); *Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D.

229, 237 (N.D. Ill. 2011) ("That [the defendant] may carry the burden of proving some of these

individual questions as part of an affirmative defense does not render those questions any less

predominant in this litigation.").

      To satisfy Rule 23(b)(3)'s predominance requirement, Tomeo must ultimately be able to

prove his case through use of "evidence that is common to the class rather than individual to its

members." *Messner*, 669 F.3d at 818 (citation omitted) (internal quotation marks omitted).

"Courts determine whether issues of individualized consent defeat commonality and

predominance in . . . TCPA cases on a case-by-case basis after evaluating the specific evidence

available to prove consent." *Physicians Healthsource, Inc., v. A-S Medication Sols., LLC*, 318

F.R.D. 712, 725 (N.D. Ill. 2016). "Generally, when the defendant provides specific evidence

showing that a significant percentage of the putative class consented to receiving calls, issues of

individualized consent predominate." *Legg v. PTZ Ins. Agency, Ltd.*, 321 F.R.D. 572, 577 (N.D.

Ill. 2017). On the other hand, "if the defendants fail to set forth this specific evidence and

instead only make vague assertions about consent, then individualized issues regarding consent

will not predominate over common questions of law or fact so as to prevent class certification."

*Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 107 (N.D. Ill. 2013).

      Here, Citi has put forth specific evidence establishing that a significant percentage of the

putative class consented to receiving calls. Hansen intentionally avoided stating an opinion on

the issue of consent in the Hansen Report, Doc. 121 Ex. 6 ¶ 63, and Citi's experts noted that the

groups that Hansen identified as individuals contacted after Citi coded the account as a Wrong

Number, Do Not Call, Cease and Desist, or Case 998 (the "Flags") did not necessarily constitute

individuals who did not consent to contact.  In the Taylor Rebuttal, Taylor reviewed a sample of over 1,000 Individual Note Screens and concluded that, because the Flags were not always accurate and accountholders frequently went back and forth between giving consent and revoking it, the only way to determine consent for each accountholder is to individually review Citi's files on each accountholder.  Doc. 121 Ex. 15 ¶¶ 16–19.  Taylor supports his opinion with specific evidence: regarding the Cease and Desist Class, he looked at accounts with Case 998 flags, reviewing about 15% of the accounts in the Case 998 data that Hansen reviewed, and 17% of the time, the accountholder re-consented to contact.  *Id.* ¶¶ 32–33.  Because some accounts in Hansen's lists received significantly more calls than others, the number of calls disqualified by individual analysis could be much higher.  Similarly, with the Wrong Number Class, Taylor examined a large portion of the accounts within the Individual Note Screens production that contained the Wrong Number flag and determined that 15% of those accounts appeared to be instances where the number did in fact belong to a borrower—instances where either the so-called wrong number later placed an incoming call to Citi, or where multiple phone numbers for an account were all flagged as wrong numbers.  *Id.* ¶ 49.  As with the consent issue, Taylor noted that the process for determining actual wrong numbers was "time-intensive" and "manual" and required review of each Individual Note Screen to know with certainty that the Citi placed the call to a Wrong Number.  *Id.*  ¶¶ 45, 48.

In addition, Sponslor conducted a more exhaustive review of the four original named plaintiffs in his rebuttal.  In his review, he considered the entire Citi file for each potential named plaintiff—Individual Note Screens, FileNet, DRI system information, and recordings of calls Citi maintains.  He determined that, whenever Citi called any of the three individuals other than Tomeo, it had consent to do so.  Doc. 121 Ex. 13 ¶¶ 48, 54, 57.  With regard to Tomeo, he found

that Tomeo's mother had represented to Citi that it could reach her through Tomeo's phone number, which she provided to Citi on multiple occasions. *Id.* ¶ 66. On this basis, Sponslor concluded that it would be necessary to consider information in the files beyond the Individual Note Screens to determine whether there was consent. *Id.* ¶ 40. The level of potential error within both classes is significant.

Tomeo responds to these arguments in a variety of ways. The strongest is that Hansen provided a common way to address the issue of consent in the Hansen Reply. In response to Taylor's criticisms regarding consent, Hansen stated that he could automatically search the Individual Note Screens for evidence that the accountholder re-consented to a phone call. Doc. 121 Ex. 6 ¶ 67. To do this, Hansen would create a database containing the Individual Note Screens data, sort the information for each account by date, and then query that information to determine when consent was revoked and re-established using "re-consent phrases." *Id.* ¶¶ 64, 67, 70. However, because Citi produced the Individual Notes Screens in Relativity rather than native format, Hansen was unable to execute this mass-search to show that it could be done. *Id.* ¶ 64. Similarly, regarding wrong numbers, Hansen stated that he could exclude numbers where the number later made an incoming call to Citi, if Citi produced calling data for incoming calls. For the numbers where multiple numbers associated with one account were all flagged WRNG at the same time, Hansen stated that he could either query the Individual Note Screens for such situations, or he could compare the wrong number calls against all of the phone numbers listed in the Call Attempts Data for each account with a wrong flag and then "run a query to determine whether all of the phone numbers listed in the Call Attempts data for each account ID with a WRNG code actually had a WRNG code in the list of calls with WRNG disposition codes." *Id.* ¶ 108.

There are multiple problems with Hansen's proposed solutions, however—the primary one being that it is not clear that Hansen's untried methodology will actually resolve the consent and wrong number issues that Citi's experts have identified. This is not a situation where individuals filled out standard forms, checking whether or not they consent to contact—there is no one word that Hansen could search to determine the consent status for each potential class member at the time of each potential violation. Hansen suggests that he search using consent-related terms that Taylor identified, but this would not resolve the issue for situations where consent is not clearly given or retracted, and the Individual Note Screens are not the only source of information related to consent. If consent is at issue, "plaintiffs must advance a viable theory employing generalized proof to establish liability with respect to the class involved, and . . . district courts must only certify class actions filed under the TCPA when such a theory has been advanced." *Gene & Gene*, 541 F.3d at 329. Tomeo emphasizes that many of the cases Citi cites on this point involves situations where the issue of consent could not be determined alone from review of the defendant's files, but instead required outside evidence such as testimony from each class member. Doc. 161 at 14. But the point is that in these cases, the issue of consent was not a uniform issue that could be determined through a common method—as here, where there is no uniform circumstance or form that indicated whether consent is present. *Compare Toney*, 323 F.R.D. at 587–88 (finding that common issues predominate where issue of consent was limited to whether class members' agreement to a uniform privacy policy constituted consent); *Stemple v. QC Holdings, Inc.*, No. 12-cv-01997-BAS(WVG), 2014 WL 4409817, at *10 (S.D. Cal. Sept. 24, 2014) (finding common issues predominate where consent issue could be determined from a standard form); *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 688 (S.D. Fla. 2013) (finding common issues predominate where consent would be determined by whether

class members gave it when they provided their phone numbers) *with Alpha Tech Pet Inc. v. LaGasse, LLC*, No. 16 C 513, 2017 WL 5069946, at *6 (N.D. Ill. Nov. 3, 2017) (finding individual issues predominate where "for each putative class member, the Court would have to undertake an inquiry as to whether that member provided a consent form, was marked as having consented in the [defendant's] database, or otherwise consented, including orally or as reflected in the customer account file"); *Legg*, 321 F.R.D. at 578 (finding individual issues predominate where "the trial in this case will be consumed and overwhelmed by testimony from each individual class member, and the [defendant's] employee who assisted that member . . ., to determine whether the class member consented to receive the calls in question"); *Wolfkiel v. Intersections Ins. Servs. Inc.*, 303 F.R.D. 287, 293–94 (N.D. Ill. 2014) (finding that individual issues predominate where "[t]he class members would not be able to present 'the same evidence [that] will suffice for each member to make a prima facie showing' that the recipients of Defendants' telemarketing calls had validly revoked his or her prior consent" (quoting *Messner*, 669 F.3d at 815)). And even taking Hansen at his word that he could mass search the Individual Notes Screens for instances where each class member cycled between consent and revocation, the Court would still need to conduct individual inquiries into whether the interactions described in those notes constituted a change in the status of consent.

The named plaintiff's situation is instructive here: to determine whether Citi had consent to call Tomeo, the parties reviewed Individual Note Screens, FileNet, Citi recordings of calls with Tomeo, and three depositions. Doc. 146-1 at 17. Moreover, the parties still dispute whether Citi had consent to call Tomeo, so a fact finder would need to sort through this evidence to determine whether Citi had consent to place calls to Tomeo. *Id.* Hansen's mass-search of the Individual Note Screen for Tomeo would not be conclusive here; the fact finder would still

23

require further individualized inquiry to determine the issue of consent. Simply put, neither Tomeo nor his experts adequately identify a common way to address the individual variations of consent and revocation that occurred in this case.

The Wrong Number Class is equally as problematic. The Taylor Rebuttal identifies two ways that he determined accounts flagged WRNG were in fact accountholder numbers. But the analyses that Hansen proposes in response do not convince the Court that he has developed a common way to isolate those who have already consented to calls. In *Davis v. AT&T Corp.*, the court considered similar circumstances: in considering certification of a class of calls to wrong numbers, the court noted that "many customers tell callers they have reached the wrong number, though the customer's number was dialed, as a 'procrastination tool' to avoid speaking on the phone" and "if Defendant's customer provided a number belonging to another person, such as a spouse or other family member, an inquiry into that customer's authority to provide consent to call that number would be required." No. 15cv2342-DMS (DHB), 2017 WL 1155350, at *6 (S.D. Cal. 2017). These same problems are present here—although Hansen proposes that he could identify some of the situations where accountholders tell Citi it has the wrong number, his proposed method would only catch situations where the accountholder called Citi afterward, or told Citi it had the wrong number for multiple phone numbers. Situations where the accountholder merely gave consent through a form or gave a family member's phone number would slip through the cracks. Ultimately, the *Davis* court found that "a complete analysis of the customer status issue would require an inquiry into each call recipient's individual circumstances." *Id.* The Court finds that the same is true here. Tomeo attempts to distinguish *Davis* by noting that the class definitions are different: in *Davis*, the class only included non-customers, while here, the class includes accountholders who previously told Citi that it called a

24

wrong number. This distinction does not save Tomeo's Wrong Number Class—even assuming that accountholders telling Citi representatives they had the wrong number would be enough to withdraw consent, the Court would still need to conduct an individualized consent inquiry for all of the reasons discussed above for accountholders. If anything, this adds to the individualized analysis.

Moreover, Hansen has not actually executed any of the methods that he proposes for determining consent or actual wrong numbers in the Hansen Reply. Citi argues that his intention to do so later is insufficient for establishing predominance for class certification. In *Parko v. Shell Oil Co.*, the Seventh Circuit rejected the district court's determination that it was "enough at this stage that the plaintiffs *intend* to rely on common evidence and a single methodology to prove both injury and damages, and that whether the evidence and methodology are sound and convincing is a question" that could be postponed until the court made a merits determination. 739 F.3d 1083, 1086 (7th Cir. 2014). Instead, it held that "if intentions (hopes, in other words) were enough, predominance, as a check on casting lawsuits in the class action mold, would be out the window." *Id.* Although the expert in *Parko* had not put forth a workable methodology, the Seventh Circuit's holding generally establishes that Court must determine whether the plaintiff has put forth actual evidence that common issues overwhelm the individual issues in the case. *Id.* The cases Tomeo cites to contradict this point are inapposite. In *Smith v. Ceva Logistics U.S., Inc.*, the calculation that plaintiff did not actually make was merely multiplication. No. CV 09-4957 CAS (RCx), 2011 WL 3204682, at *2 (C.D. Cal. July 25, 2011). Second, in *Meyer v. Bebe Stores, Inc.*, the district court declined to decertify a class on the basis of manageability, not predominance, where the plaintiff's expert averred that he could analyze a list of telephone numbers to determine which would have been sent a text message,

even though the defendant argued that the analysis would not conclusively determine who received the text messages.  No. 14-cv-00267-YGR, 2017 WL 558017, at *4 (N.D. Cal. 2017).  Tomeo cannot establish predominance based on Hansen's proposed, but unexecuted and unproven analysis.

Tomeo also contends that, even if consent requires some individual attention, it is not significant enough to prevent other common issues from predominating.  This goes against all of the cases cited above where courts have found that, where the defendant provides specific evidence that a significant number of putative class members consented to contact, individual issues of consent predominate.  *See, e.g. Legg*, 321 F.R.D. at 578.  Moreover, the cases that Tomeo relies upon are inapposite.  In *Tyson Foods, Inc. v. Bouaphakeo*, the Supreme Court stated that "[w]hen 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'"  --- U.S. ----, 136 S. Ct. 1036, 1045, 194 L. Ed. 2d 124 (2016).  But this is not a situation where "some individual class members" are affected; most or even all class members will require this inquiry.  Plaintiffs argue that this case is like *Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, a TCPA case where the court noted that "[h]ow many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified."  747 F.3d 489, 491 (7th Cir. 2014) (internal quotation marks omitted).  But *Arnold Chapman* does not address issues of predominance, rather considering whether putative class members had standing to sue.  747 F.3d 489, 491 (7th Cir. 2014).

And in the cases where the Seventh Circuit held that class certification could be appropriate even though causation or damages required individual proof, the issues requiring individual proof did not directly affect whether the defendant was liable for some violation of the law. *See, e.g., McMahon v. LVNV Funding, LLC*, 807 F.3d 872, 875 (7th Cir. 2015) (finding that the predominate issue was whether the defendant's actions violated the FDCPA, not whether that violation damages the class members); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (holding that the central question in the case was whether the product at issue was defective when it left the factory, not whether that defect proximately caused the class members' damages). The individualized issues in those cases could be separated from the primary issue of liability. Here, on the other hand, consent is inextricably intertwined with primary issue of liability to the point where it predominates over the other common issues in the case. If Citi had consent to place a call, it did not violate the TCPA at all. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 351 (internal quotation marks omitted). Addressing the common questions that Tomeo has identified will not sufficiently drive the resolution of the litigation to convince the Court to look past the issue of consent.

Tomeo's last argument is that the percentage of potential consent issues that Taylor identified is not material, and the parties could alternatively agree to reduce damages by 15 or 17 percent to account for the calls Taylor contends were made with consent. This argument does not hold water. The purpose of Taylor's exercise was to identify some flaws in the potential classes, not all of the flaws. He merely considered Individual Note Screens, rather than all of the information Citi has regarding each account. As Sponslor's more exhaustive review of the

potential named plaintiffs' files revealed, it is often necessary to go beyond the Individual Note Screens to fully determine the issue of consent. Doc. 121 Ex. 13 ¶ 40. In addition, Citi's counsel reviewed a sample of Individual Note Screens for 1,000 accounts and determined that they would press for individualized inquiry on the issue of consent regarding more than 70 percent of those accounts. Based on this analysis, it is clear that the problems Citi has identified regarding consent in the potential Classes is material, and likely goes beyond the specific percentages that Taylor identified. Tomeo's reliance on *Mullins v. Direct Digital, LLC* is entirely off-base here: *Mullins* addresses an entirely different aspect of class certification (ascertainability). Moreover, the quote that Tomeo cites ("the addition or subtraction of additional class members affects neither the defendant's liability nor the total amount of damages") contemplates a situation where money is stolen from a pension fund, and so no matter the number of employees subscribed to the pension fund who make up the class, the liability and amount of damages remain the same. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 670 (7th Cir. 2015). This does not apply in this situation, where the number of TCPA violations (and thus liability and damages) changes based on the number of calls, which changes based on the number of phone numbers included in the potential classes.

In the face of Citi's evidence that it had consent for a significant percentage of potential class members, Tomeo has failed to establish a way to determine consent on a classwide basis. Thus, individualized issues of consent predominate, and Tomeo has not carried his burden under Rule 23(b)(3).

## CONCLUSION

For the foregoing reasons, the Court denies Tomeo's motion for class certification [123] and grants in part and denies in part Citi's motion to strike Jeffrey Hansen's expert opinion and testimony [141].

Dated: September 27, 2018

SARA L. ELLIS
United States District Judge